COLEMAN, Justice,
for the Court:
¶ 1. The Mississippi Commission on Judicial Performance issued a Formal Complaint against Chancellor David Shoemake on October 17, 2013, alleging judicial misconduct. After a formal hearing on March 12, 2015, the Commission recommended to the Supreme Court that Judge Shoemake be removed from office, fined $2,500, and assessed costs in the amount of $5,882.67. Judge Shoemake, disputes the Commission’s findings and recommendation. We hold that Judge Shoemake improperly signed ex parte orders and contributed to the mismanagement; of a ward’s estate. However, the Commission did not prove by clear and convincing evidence that Shoe-make gave testimony that he knew or should have knowri would be misleading. *1213 We order that Judge Shoemake shall be publicly reprimanded, shall be suspended from office for a term of thirty days without pay, shall pay a fine of $2,500, and shall pay costs in the amount of $5,882.67.
BACKGROUND
Factual History
¶ 2. On October 11, 2013, during a regularly scheduled meeting of the Commission, the Commission found probable cause to file a Formal Complaint against Chancellor David Shoemake of the Thirteenth Chancery Court District. The Complaint contained allegations that Judge Shoemake had contributed to the mismanagement of the conservatorship of Victoria Denise Newsome, whose case is already well-known to the Court. See Mississippi Comm’n on Judicial Performance v. Walker, 172 So.3d 1165 (Miss.2015); In the Matter of the Conservatorship of Victoria Denise Newsome, Cause No. 2010-0146, in the Chancery Court of Simpson County, Mississippi. Regrettably, the Court must once again address judicial misconduct connected to Newsome’s conservatorship.
¶ 3. The case of Victoria Newsome’s con-servatorship had been assigned to Judge Joe Dale Walker in Simpson County, Mississippi. Walker ordered that Marilyn. Newsome, Victoria’s mother, serve as the conservator for the conservatorship and approved the medical negligence settlement that then funded Victoria’s conserva-torship. Walker further ordered that the chancery court’s law clerk, Keely McNulty,[1] serve as both the attorney for the conservator (Marilyn Newsome) and as guardian ad litem for Victoria Newsome.
¶4. Walker ordered that a house be built for the use and benefit of Victoria' Newsome and tasked McNulty with soliciting a minimum of four construction bids. C.T. Construction, owned by Walker’s nephew, Chad Teater, submitted one of the four bids. Because Walker’s family member- submitted a bid, on July 21, 2011, McNulty sent Shoemake a seventeen-page fax, including a petition, a proposed order, and five bids. On July 22, 2011, Walker entered an Order Transferring Cause for Limited Purpose “of approving and acceptance of the bid(s) for the construction of the home for the ward.”
¶ 5. On August 2, 2011, the court clerk filed Shoemake’s Order Concerning Approval and Acceptance of Bids for the Construction of a Residence for the Ward. The Order stated that Shoemake had reviewed the petition and bids and that he was approving the lowest bid for the amount of $273,075.14. Finally, the order transferred the case back to Walker. Shoe-make testified at his show cause hearing that he “recalled] writing [his] own order because [he] felt that [McNulty’s proposed order] was not appropriate.”
¶ 6. Over the next several months, Shoe-make executed and filed four more orders affecting the Newsome Conservatorship. A second order was filed on August 2, 2011, approving the Construction Management Agreement of C.T. Construction. No petition requesting relief exists at all within the court file or the exhibits presented to the Court.
■¶ 7. A third order, filed August 9, 2011, authorized the transfer of $258,395.14 to Marilyn Newsome’s Conservatorship Account “for the construction of the ward’s permanent home.” McNulty had informed Shoemake via email that the bank had refused to release the funds without a court order explicitly authorizing it to do so. When Shoemake replied, asking whether he could sign the attached order *1214 and at what point Judge Walker would take' the ' case back ■> from- Shoemake, McNulty responded that either he or Walker could ■ sign the order. McNulty further told Shoemake that “Judge Walker wanted [Shoemake] to handle all portions related to approving the bids/management contract/etc.” A petition for this relief had not been filed; according to McNulty’s email, the order “piggy back[ed]” upon the August 2, 2011, order.
¶8. A fourth order, filed January 25, 2012, disbursed $23,000 to the home’s contractor, allegedly as reimbursement for stolen tools. The petition requesting the relief was unsworn and signed only by McNulty, despite the petition having been filed on behalf of Marilyn Newsome.
¶ 9. A fifth order bears the handwriting of multiple parties. Dated March 26,2012, and signed ‘ by Shoemake, the order changed the bid amount from $273,075.14 to $296^575.15. In the margin beside the numbers, a feminine-appearing script noted that the change was effective, nunc pro tunc, to the order filed August 2, 2011, which accepted the C.T. Construction bid as the lowest of the five bids submitted. Walker handwrote that the order was “filed” on March 26, 2012. The petition requesting the relief was unsworn and signed only by McNulty.
Procedural History
¶ 10. After events occurring outside the scope of the case sub judice, Marilyn New-some demanded that McNulty cease representing her as the attorney for the conservator. She also filed a complaint with the Commission on May 2, 2013, alleging that Walker and Shoemake had worked in concert to siphon money from the conservar torship, to allow the poor construction of the handicapped-accessible home for Victoria, to protect McNulty, and generally to cover up their misconduct.
¶ 11. The Commission also voted unanimously to enter an Order to Show Cause why the Commission should not recommend to the Supreme Court of Mississippi that Shoemake be suspended from office during "the pendency of the Commission’s inquiry into the allegations of misconduct. The Commission filed the Order to Show Cause on October 16, 2013. On October 17, 2013, Shoemake was given notice of the Formal Complaint against him, laying out the factual background of the complaint. Shoemake claims that the receipt of the Formal Complaint was the first notice he had of proceedings against him; the Commission maintains that he had been on notice since August, when he discussed with Commission staff the allegations of misconduct lodged against Judge Joe Dale Walker.
¶ 12. The Commission entered an Amended Order to Show Cause on October 30, 2013, instructing Judge Shoemake to appear at the offices of the Commission on Friday, November 1, 2013, for his show cause hearing. On October 31, Judge Shoemake appeared at the Commission Office to testify at Judge Walker’s show cause hearing. McNulty asserted her Fifth Amendment right to remain silent at Walker’s'hearing. The next day, at Shoe-make’s show cause hearing, she also asserted her right to remain silent, refusing to answer questions about her involvemént with the orders at issue in the Formal Complaint against Shoemake.
¶ 13. . At the November 1, 2013, show cause hearing, Shoemake admitted remembering drafting and signing the first order approving the C.T. Construction bid for $273,075.14., He denied any knowledge' of the last four orders and denied that he had signed them. The Commission, at the time of the show cause hearing, had not produced any petitions accompanying the orders in question, and Shoemake stated that-.he signs only orders supported by petitions.
*1215 ¶ 14. After the show cause hearing, the Commission moved to amend its Formal Complaint, which motion the Committee granted after a hearing. The First Amended Complaint[2] alleged three counts of judicial misconduct against Shoemake. Count One alleged that he improperly-signed the above-mentioned orders, violating Canons 1, 2A, 2B, 3B(2), 3B(7), 3B(8), and 3C(1) of the Mississippi Code of Judicial Conduct. Count Two alleged that Judge Shoemake “adamantly denied that the signatures, belonged to him” — excluding the very first Order — and that Judge Shoemake “knew or should have known that his responses to the questions at the hearing were deceptive and misleading.” The Commission argued that Shoemake’s conduct violated Canons 1, 2A, and 3B(2) of the Code of Judicial Conduct. Coúnt Three alleged that Judge Shoemake’s actions, as outlined in Counts One and Two, violated Section 177A of the Mississippi Constitution of 1890, as amended, “as said conduct constitutes willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.”
¶ 15. At the beginning of the formal hearing on March 12, 2015, the Commission’s Panel noted that it must determine two issues:
1) Whether Judge Shoemake signed the orders identified in Count I of the amended formal complaint under the circumstances alleged.
2) At the time of the Show Cause hearing, whether Judge Shoemake knew, or should he" have known, that his testimony was deceptive and misleading.
Counsel for the Commission called three witnesses: Richard Courtney,[3] as an expert in the field of conservatorship eases in chancery court; Marilyn Newsome, the mother of Victoria Newsome and the Conservator for Victoria’s Conservatorship; and Shoemake. Judge Shoemake’s counsel called two witnesses: Donna Walker, Shoemake’s administrator; and Wallace Allred, as a character witness.
> ¶ 16. The Committee issued its Findings of Fact and Recommendation on June 25, 2015. The Commission stated that it found by clear, and convincing evidence that Shoemake had signed the orders at issue and, that he knew or should - have known that his testimony at, the show cause hearing had been misleading. The Commission determined that the willful misconduct ánd prejudicial conduct violated Canons 1,' 2A, 2B, 3B(2), 3B(7), 8B(8), and 3C(1) of the-Judicial Code. The Commission determined" further that Shoemake had ignored his responsibility as a superior guardian to a ward. The Commission concluded that Shoemake had exhibited willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute, in violation of Section 177A of the . Mississippi Constitution of 1890.
¶ 17. The Commission then recommended that the Supreme Court of Mississippi remove Shoemake from office, impose a fine of $2,500, and assign to him costs of $5,882.67. The matter then came before the Supreme Court of Mississippi for its consideration and decision.
ANALYSIS
¶ 18. The Court has the power, “[o]n recommendation of the' commission *1216 on judicial performance,” to “remove from office, suspend, fine or publicly censure or reprimand any justice or judge of this state for ... willful misconduct in office ... or conduct prejudicial to the administration of justice which brings the judicial office into disrepute[.]” Miss. Const, art. 6, § 177A. The Court serves
as the ultimate decision-maker in judicial performance cases, makes the final determination as to the appropriate sanction to be taken when a judge has committed willful misconduct or conduct prejudicial to the administration* of justice that brings the judicial office into disrepute, and must conduct an independent review of the entire record.
Miss. Comm’n on Judicial Performance v. Skinner, 119 So.3d 294, 299 (¶ 9) (Miss.2013) (citing Miss. Comm’n on Judicial Performance v. Boone, 60 So.3d 172, 176 (¶ 8) (Miss.2011)). In reviewing the. case, the Court conducts an independent inquiry of the record before making a “final determination of the appropriate action to be taken in each case[.]” Boone, 60 So.3d at 176 (¶ 8) (quoting In re Removal of Lloyd W. Anderson, Justice Court Judge, 412 So.2d 743 (Miss.1982)).
¶ 19. To impose sanctions, the Court “must find clear and convincing evidence of misconduct.” Miss. Comm’n of Judicial Performance v. Carver, 107 So.3d 964, 969 (¶ 20) (Miss.2013) (citing Boone, 60 So.3d at 174, 184). The Court accords careful consideration of the Commission’s findings of fact and recommendations, or those of its Committee, but those findings and recommendations do not bind the Court. Skinner, 119 So.3d at 299 (¶ 9). The Court may impose a sanction beyond the one recommended by the Commission. Id. The Court also may impose a sanction less severe than the one recommended by the Commission. Boone, 60 So.3d at 184-85 (¶ 34).
I. By signing the ex parte orders, Judge Shoemake violated Canons 1, 2A, 2B, 3B(2), 3B(7), 3B(8), and 3C(1) of the Code of Judicial Conduct and Section 177A of the Mississippi Constitution of 1890.
¶20. The' Commission has presented clear and convincing evidence that Shoemake signed the five ex parte orders charged against him; he admitted doing so at the Formal Hearing. The supporting petitions available for our review are both unsworn and not signed by the stated conservator-petitioner Marilyn Newsome. The sole issue that remains to be determined by the Court is whether such conduct constitutes judicial misconduct under the Code of Judicial Conduct and Section 177A of the Mississippi Constitution of 1890. While the Court acknowledges that, in ex parte chancery court proceedings, it is common, and usually legitimate, for attorneys to confer with chancellors concerning the routine management of the business of wards, in the current circumstances, we find Shoemake’s private conferences with McNulty and other conduct at issue in the instant case do indeed violate the Code and Constitution.
¶21. Arguing that the petitions sufficiently supported his orders because they had been signed by McNulty, Marilyn Newsome’s attorney, Shoemake relies on Mississippi Rule of. Civil Procedure 11. Rule 11 states that all pleadings and motions must be signed by an attorney of record, and “[e]xcept when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit.” The Court rejects Shoe-make’s argument, as Chancery Court Rule 6.13 indeed requires verification or affidavit as “specifically provided by rule or statute.” Rules regarding the chancery court’s administration of a ward’s estate are found under Uniform Chancery Court *1217 Rule 6.00, or “Rules Concerning Probate Matters.” See Miss. Unif. Chancery Court Rules 6.02, 6.08, 6,09. Uniform Chancery Court Rule 6.13 requires all pleadings filed by a fiduciary, regarding a probate matter to be “personally signed and sworn to by [the attorney].” McNulty’s signature alone, without additional notarization, was insufficient support for an order touching upon the administration of Victoria New-some’s conservatorship.
¶22. Beyond the failure to adhere to chancery court rules, it was further error for Shoemake to grant the relief requested without further investigation into the matters beyond what McNulty presented to him. Shoemake stated at both his hearings that where an uncontested petition is presented to him, he generally went ahead and executed an order granting the requested relief. However, where a ward is involved, the Court has emphatically instructed that
[t]he court will take nothing as confessed against [the ward]; will make for them every valuable election; will 'rescue them from faithless guardians, designing strangers, and even from unnatural parents, and in general will and must take all necessary steps to conserve and protect the best interest of those wards of the court.
Union Chevrolet v. Arrington, 162 Miss. 816, 138 So. 593, 595 (1932). The chancellor is considered the “ultimate guardian” of a ward. Jackson v. Jackson, 732 So.2d 916, 920 (Miss.1999). For Shoemake to sign orders without further consideration of the facts at hand was -a disservice to the ward and conservatorship. That the- con-servatorship was originally assigned to Walker is beside the point. When Shoe-make signed the orders, he affected Victoria’s estate. Had Shoemake made a basic inquiry into who was representing the ward’s interests,, and not just the Conservator’s interests,. he quickly would have discovered McNulty’s .dual roles as both Victoria’s guardian ad litem and as the attorney for the conservator for the con-servatorship.
¶23. We hold that by executing the five ex parte orders concerning a ward, Shoemake violated Canon 1 (“A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards....”); Canon 2A (“A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.”); 2B (“Judges ’Shall not allow their family, social, or other relationships influence the judge’s judicial conduct or judgment.”); 3B(2) (“A judge shall be faithful to the law and maintain professional competence in' it.”); 3B(7) (“A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge .outside the presence of the parties concerning a pending or impending proceeding....”); , 3B(8) .(“A judge shall dispose of all judicial matters promptly, efficiently and fairly.”); and 3C(1) (“A judge’ shall diligently discharge the judge’s administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration — ”).
¶ 24. Subsections (b) and (e) of Section 177A of the Mississippi Constitution provide that the Court may sanction a justice or judge for “willful misconduct in office” and “conduct prejudicial to the administration of justice which brings the judicial office into disrepute.” As to willful misconduct, the Court has stated that “actual wilfullness. is not always required, as a judge’s negligence or ignorance not amounting to that can have the same effect of being prejudicial to the administration of justice- and; bringing the judicial office *1218 into disrepute.” Mississippi Comm’n on Judicial Performance v. Fowlkes, 121 So.3d 904, 907 (¶ 5) (Miss.2013). By accepting unsworn petitions and wholly failing to conduct further inquiry into the matters presented to him for relief, Shoe-make exhibited, at the very least, negligence with regard to the administration )f Victoria’s estate. Shoemake failing to ait as Victoria’s “superior guardian” on five independent occasions constitutes conduct prejudicial to the administration of justice which brings the judicial office into disr 3-pute.
II. The Commission did not offer clear and convincing evidence that Shoemake gave testimony at the show cause hearing that he knew or should have known was misleading.
¶25. In its findings of fact, the Commission stated that it found, by clear and convincing; evidence, that Shoemake gave false and misleading testimony at the show cause hearing, that he gave “adamant” and “unqualified” statements that the signatures'on the orders were not his, and that Shoemake changed his answers only after a handwriting analysis determined that he had signed the orders at issue; While-we have not had the opportunity to observe Shoemake’s demeanor'at both hearings, the plain text of the show cause apd formal hearing transcripts cast doubt upon the Commission’s findings. Our doubt rises to a degree that we cannot find by dear , and convincing evidence that Shoemake gave false, or misleading testimony constituting judicial misconduct.
¶26. “Clear and convincing evidence” is such- a high evidentiary standard that it surpasses even the standard of “overwhelming weight” of the evidence. In Interest of C.B., 574 So.2d 1369, 1375 (Miss.1990); Moran v. Fairley, 919 So.2d 969, 975 (¶ 24) (Miss.Ct.App.2005), certio-rari dismissed as improvidently granted. The United States Supreme Court has placed an “intermediary standard” between “mere preponderance of the evidence” and “beyond a reasonable doubt” Addington v. Texas, 441 U.S. 418, 423-24, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). In Carver, 107 So.3d at 969-70 (¶ 20), we cited the Fifth Circuit’s “useful definition” of the “clear and convincing” evidentiary standard. Clear and cohvincing evidence is
[t]hat weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts of the cáse.
Id. (citing In re Medrano, 956 F.2d 101, 102 (5th Cir.1992) (finding “clear and convincing evidence” an appropriate eviden-tiary - standard for . attorney-disbarment proceedings in federal court)) (internal citations omitted).
¶ 27. Before the show cause hearing on November 1,- 2014, the Commission represented to Shoemake - that it intended to rely on the Newsome- Conservatorship case file for the show cause hearing. Neither party had. completed discovery, and the record indicates that the case file- itself was incomplete. • The Commission was not, therefore, able to produce the petitions corresponding to, the orders or all the emails in which McNulty requested .that Shoemake draft particular orders. For example, the night between Walker’s show cause hearing and Shoemake’s own .show cause hearing, Shoemake’s administrator reviewed an email chain and located the order filed August 2, 2011, which approved the Construction Managemént Agreement. Shoemake printed the order and brought it *1219 to his show cause hearing the next day, and the Commission admits that it had no knowledge of that order until Shoemake provided it. Additionally, Shoemake’s administrator did not discover the original faxed petition for Shoemake to approve a construction bid, along with the five attached bids, until after the show cause hearing.[4]
■ ¶ 28. The Commission asserted ■ in its findings of fact that, at his show cause hearing, Shoemake “adamantly and repeatedly” denied signing the latter four ex parte orders and that he made-“absolute, unconditional statement^]” that he did not sign orders without petitions. First, we note that the Commission’s questions and Shoemake’s answers at the show cause hearing turn upon the presumption on the part of both parties that certain later-discovered petitions did not exist at all. Second, Shoemake in fact made multiple qualifying statements qualifying his answers at the show cause hearing:
Q: Do you recall signing [the August 2, 2011 order accepting the C.T. Construction bid]. .....
A: Yes, ma’am. I did sign that order, and .1 do recall the circumstances. But for, me to tell you the — some two-plus years after the exact signing, I can’t tell you everything that transpired. I have a general recollection of what happened.
[[Image here]]
A: ... I can’t remember the detail that far back....
[[Image here]]
A: I’ve seen [the petition] before today in going through trying, to figure out what’s happened in here, but I haven’t studied it in detail.
[[Image here]]
A: I don’t-have a satisfactory explanation. I can’t — I can’t figure it out. And I can’t name names or point fingers. But somehow or another somebody put my signatures on an order without presenting that order to me.
[[Image here]]
Q: Is it your testimony that [the August 2, 2011, order] was your only involvement in this case, is signing that order and sending it back to Judge Walker?
A: Yes, ma’am. Othér than with you and the investigator and other than you and the FBI agents and other than with me trying to read the [Newsome Con-servatorship] file in the past two weeks to try to find out what happened.
[[Image here]]
A: The orders do have a resemblance to my signature,
[[Image here]]
A: It looks like my signature, but I don’t think it is. If it’s on there, it was not knowingly put on there by David Shoemake.
[[Image here]]
Q: And the rest of them [the later 4 bids] you deny your signature is on those.
A: Yes, ma’am. With what I know now, I’ve got to say those .aren’t my signatures.
Shoemake also .testified at his show cause hearing that he had not spoken to Walker about the case because “the FBI agents told me not to. They interviewed me in your office here in August. And they told me not to talk to Judge Walker. And I have not talked to Judge Walker.”
*1220 ¶ 29. As to the Commission’s assertion in its Findings of Fact that Shoemake had changed his answers “only” after a handwriting analysis, rendering his show cause testimony “false,” Shoemake gave a different explanation at his formal hearing:
Q: You now admit that you signed this order [the August 9, 2011 order]. Is that correct?
A: I admitted that in February of 2014.
Q: Do you admit that today?
A: Of course.
Q: So all of this information on page 37 [of the show cause transcript] is false. Do you agree?'
A: it’s not false. I was trying to— [interruption removed] — go from, my memory and from my knowledge of what had gone on on that — on November the 1st. I didn’t have access to the — all the petitions and the E-mails and the attorney’s billings. I didn’t have access to all of those things. I was operating under the assumption that there were no petitions. And I just don’t sign stuff without petitions.
[[Image here]]
I’m sitting here on November the 1st. I have had 12 days to answer a complaint to try to .get me [suspended].... I’ve just been told that the lawyer involved in this was taking the Fifth Amendment. I had been told by the FBI in August that I had done nothing wrong, that I was — my involvement was unwitting[]
... And they got through with me. And they told me, said, “Judge Shoemake, do not talk with Keely McNulty. Do not talk with Joe Dale Walker. And, if they call you, here is our card. You call us and let us know.” ... But I didn’t have any documents to go back and look at.... There was nothing in the court file that I could go back and look at to see how this order got signed or what— why I would have signed such an order. So I had my doubts about those signatures.
Even after November the 1st we were looking at hiring a handwriting expert, because I didn’t believe those were my signatures.
When we found the file [with the original bids] and we saw the [information about Walker on the Supreme Court website], we abandoned the attempt to get a handwriting expert.
So on November the 1st, faced with what I knewñn November the 1st, I just could not be satisfied that those were my signatures. And true — true—true— I’m telling you — and I told, in February, that it was my signature on August the 2nd.
¶30. Shoémake made multiple similar statements throughout the formal hearing, stating over and over again that his perception of the case had changed bnce he had gained access to more information. In particular, Shoemake stated that he had reviewed documents and transcripts related to Walker’s case that had been filed on the Supreme Court website; he had discovered emails on his own server-that he had provided to the Commission as well; and, as already noted, that his administrator had located the' lost' construction-bid petition. ’ Nowhere in the Commission Findings does the Commission address the above-described qualifications or clarifications to Judge Shoemake’s testimony.
¶ 31. We simply cannot agree that the Commission presented us with “clear and convincing”'evidence that Shoemake gave false and misleading testimony at his show cause hearing when the Commission does not acknowledge the multiple qualifying statements within Shoemake’s testimony on both November 1, 2014, and on March 12, 2015. ' Further, the Commission has not provided any sworn testimony to contradict Shoemake’s plausible version of *1221 events regarding why he first denied, then admitted to, signing the orders in question. At the formal hearing, the Commission called only Courtney and Newsome, neither of whom had personal knowledge of the execution of the ex parte orders alleged in the Formal Complaint, nor of the testimony produced at the hearings.
¶ 32. The Commission presents a scenario of false and misleading testimony that may well have occurred. However, we have conducted an independent inquiry of the record, and we do not find “evidence so clear, direct and weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy,” that Shoemake gave deceptive answers at his show cause hearing on November 1, 2014. Moran, 919 So.2d at 975 (¶ 24). Therefore, we cannot hold that, with respect to his candor before the Commission panel, Shoemake violated any Canon of the Code of Judicial Conduct or that he violated Section 177A of the Mississippi Constitution.
III. Shoemake’s judicial misconduct warrants a thirty-day suspension without pay and assessment of a fine and costs.
¶ 33. The Commission has recommended that Shoemake be removed from office, fined $2,500 and assessed costs in the sum of $5,882.67. In balancing the six factors required in all judicial misconduct cases, removal from office would be over-proportionate to the harm committed. Instead, we suspend Shoemake from the bench for thirty days, in addition to assessing a $2,500 fine and $5,882.67 in costs,
¶ 34. When implementing sanctions against judges, we remember that' “[t]he primary purpose of sanctions ‘is to restore and maintain the dignity and honor of the judicial office and to protect the public against future excesses,’ rather than punishment of the individual.” Skinner, 119 So.3d at 300 (¶ 12) (quoting Miss. Comm’n on Judicial Performance v. Boone, 60 So.3d 172, 185 (¶ 35) (Miss.2011)). In determining appropriate sanctions, the Court must consider
(1) the length and character - of the judge’s public service;
(2) whether there is any prior caselaw on point;
(3) the magnitude of the offense and the harm suffered;
(4) whether the misconduct is an isolated incident or evidences a pattern of conduct;
(5) the extent to which the conduct was willful, and the extent to which the conduct exploited the judge’s position to satisfy his or her personal desires or was intended to deprive the public of assets or funds rightfully belonging to it;
(6). the presence or absence of mitigating or aggravating factors.
See Skinner, 119 So.3d at 300, 306-07 (¶ 12, 32) (Miss.2013) (stating the traditional six factors and replacing consideration of “whether moral turpitude was involved” with the text of factor (5)).

1. Length and Character of Public Service

¶ 35. Shoemake became a judge in January 2011 and is. in his second term as chancellor.
2. Whether Caselaw Exists that is on : Point
¶ 36. The Court has handed down several decisions regarding ex parte actions taken by judges. In Boone, the Court determined that a suspension, a reprimand, and costs of the proceeding were appropriate for the misconduct considered, not removal from office as recommended by the Commission. In that case, a judge had engaged in ex parte communication with a female defendant and had reduced *1222 her fine as a result of those communications. Boone, 60 So.3d at 174 (¶ 1 2). During that out-of-court conversation "with the defendant, Boone allegedly ' had touched the defendant inappropriately and implied that if she performed a sexual act, he would “fix her fíne.” Id. at 175 (¶ 3). After review, the members of the Boone Court could not come to a.consensus “on whether the facts surrounding this alleged sexual misconduct ... ha[d] been established by clear and convincing evidence.” Id. (¶ 2). Therefore,' we decided against removing Boone from office and instead ordered a ninety-day suspension without pay, a. public reprimand, and responsibility for the costs of the proceeding. - Id. at 174 (¶2).
¶37. In Mississippi Commission on Judicial Performance v. Gordon, 955 So.2d 300 (Miss.2007), we determined that Gordon’s involvement in e parte communications and traffic-ticket fixing warranted a public reprimand, a thirty-day suspension, and assessment of costs. Gordon had spoken with multiple- defendants out of court, had not required' them to appear before him, and had “passed” their traffic tickets to the file over the objection of the issuing officer. Id. at 303 (¶ 6). Reiterating how seriously the Court takes ticket-fixing and ex parte communications, we issued the above sanction. Id. at 304 (¶¶ 8-9).
¶38. Finally, in Mississippi Commission on Judicial Performance v. Dearman, 66 So.3d 112, 117 (¶ 16) (Miss.2011), we issued a public reprimand, a thirty-day suspension without pay, and payment of costs where Dearman had reduced or altered the. bonds of multiple defendants without proper motions and - had engaged in ex parte communications.
¶ 39. As with the above-cited cases, Shoemake engaged in out-of-court conversations'with McNulty with regard'to issues he believed to be under his consideration. Further, despite the importance of'being fully informed before making a decision that touched upon a ward’s estate, Shoe-make did not require a representative for Victoria’s interests to testify at a hearing. Finally, Shoemake issued all of his orders without holding a hearing, and some of them without properly filed petitions.
If 40. Failing to act as the superi- or guardian of a ward is' grievous indeed, and at first blush appears to require a longer suspension. However,, in the past, we have instituted thirty-day suspensions without pay for judges who had deprived citizens of their liberty and who had attempted to. subvert and obstruct criminal proceedings. The polestar of determining judicial misconduct sanctions is that the sanction should “fit the offense and be consistent with other like cases.” Miss. Comm’n on Judicial Performance v. Sanford, 941 So.2d 209, 21, 5 (¶ 11) (Miss.2009). Because Shoemake’s misconduct did not rise to the level of the misconduct detailed below, we determine it inappropriate to extend his suspension beyond thirty days.
¶ 41. In Sanford, 941 So.2d at 210 (¶ 2), an officer arrested a person for driving under the influence. Sanford arranged for the arresting officer to arrive late at the court date, and then Sanford dismissed the charge for failure to prosecute, as had been his intention. Id. We issued a thirty-day suspension, without pay, a public reprimand, and court costs. Id. at 210 (¶ 1).
¶42. In Mississippi Commission on Judicial Performance v. Littlejohn, 172 So.3d 1157, 1159 (¶ 2) (Miss.2015), Chancellor Littlejohn ordered a father to pay $15,000 in attorneys’ fees to the mother of his child. While the appeal of the order pended, the father - posted a supersedeas bond and did- not pay the ordered sum. Id. (¶ 3). Littlejohn acknowledged the existence of the supersedeas bond but held *1223 the father in contempt of court and had him incarcerated. Id. Only an emergency appeal filed with the Supreme Court resulted in the father’s release after three days and two nights in jail. Id, .Though the Commission recommended only a,public reprimand and a fine, we instead suspended Littlejohn for thirty days without pay, ordered a public reprimand, and assessed a $1,000 fine and court costs. Id. (¶ 1). In determining the weight of the sanctions, we also .noted that Littlejohn already had once been sanctioned with a public reprimand for abusing his contempt powers. Id. at 1163 (¶ 22).

S. The Magnitude of the Offense and the Harm Suffered .

¶ 43.' Shoemake contributed to the overall mismanagement of Victoria’s con-servatorship and was directly responsible for the unchecked dissipation of $23,000 from her accounts. . Because chancellors serve as the ultimate guardians of their wards’ estates, his negligent management of the petitions and orders' has eroded the confidence the public should hold in the judiciary. Yet, when one considers the offense and punishment in Littlejohn, above, one notes that, even for the wrongful deprivation of the liberty of a litigant, and even as a subsequent disciplinary matter, the Court did not remove Chancellor Littlejohn from office.
¶ 44. Justice King dissents in part from our opinion. Because the Court may increase sanctions when appropriate, he believes that, in addition to the sanctions we have decided upon in „ the present opinion, Shoemake should additionally “make Victoria’s estate whole.” King, J., Op.. ¶ 58. Without expressly stating so, Justice King essentially argues that .Shoemake should pay restitution to Victoria’s wardship estate. We reiterate first that the Court issues sanctions to maintain the dignity of the judiciary and to guard against future excesses, not to punish individual judges. Skinner, 119 So.3d at 300 (¶ 12) (quoting Roone, 60 So.3d 172, 185 (¶ 35)). Second, the Court already has considered a Commission recommendation of a restitution-ary payment and determined that such a sanction would be improper, as “restitution is'not one of the sanctions permitted” by Section 177A. In re Branan, 419 So.2d 145, 146 (Miss.1982). We therefore decline to order restitution and leave the decision of whether or not to pursue those or similar dámages with Victoria and her wardship.

h. Whether the Misconduct is an Isolated Incident or Evidences a Pattern of Conduct

¶ 45. Shoemake has not been, investigated by the Commission, or disciplined by the Court before now*, The Commission also has not presented any evidence of other mishandled orders on petitions from Shoemake’s chambers. However, there exists an implication from, the totality of Shoemake’s testimony that, until the Commission lodged its Complaint against him, he simply executed orders granting relief without a hearing where petitions were unsworn and presented to him as unopposed. At the formal hearing, Shoemake testified that he has adjusted his practice:
Q: Has [accepting' unsworn petitions] been your contiiiued practice?
A: No, sir, it hasn’t. .1.1 don’t care what anybody else'does. The way I do it is I make sure the fiduciary’s signed off and sworn to. And if there’s a — I jusf make sure. I.don’t care what anybody else [does].
5. Whether Shoemake’s Conduct was Willful, Intended to Deprive the Public of Assets, or Exploited the Judge’s Position ..
¶ 46. We find following excerpt from the Commission’s Findings of Fact to be an excellent response:
*1224 Respondent testified that he was influenced by another judge to involve himself in the Newsome Conservatorship. Respondent’s actions when signing the orders presented to him by McNulty may not have been intended to commit harm to the ward, but they did; and his actions were not performed with the degree of diligence required of a chancellor overseeing a ward’s estate. Respondent testified that he trusted and had faith that lawyers presented him with documents that were truthful and in the best interest of their plients. However, by relying on lawyers to be ethical and forthright, and failing to follow the Uniform Chancery Court Rules, and his responsibilities as a “superior guardian,” Respondent failed in one of his most important roles as a chancellor.

6. The Presence or Absence of Mitigating Factors

¶47. We are unaware of either the presence or absence of mitigating factors other than the fact that Shoemake has admitted that he indeed signed the orders at issue.
CONCLUSION
¶ 48. Judge Shoemake’s negligence and inattention while executing ex parte orders resulted in the dissipation of assets from Victoria Newsome’s Conservatorship. As Chancellor, he carried a duty to act as the superior guardian of her interests, no matter for how short or long a time that her case was under his purview. For the reasons detailed above, we do not accept the Commission’s recommendation that Judge Shoemake be removed from office. Instead, we hereby order a public reprimand, a suspension from office for a period of thirty days without pay, a fíne of $2,500, and assessment of court costs of $5,882.67 against Judge Shoemake. The public reprimand shall be read in open court by the presiding judge of the Circuit Court of Simpson County on the first day of the next term of that court in which a jury venire is present after the issuance of the Court’s mandate in this case, with Judge Shoemake in attendance.
¶ 49. The Clerk of this Court shall send copies of this opinion and the mandate of the Court to the Chancery Clerk of Simpson County, and to the Circuit Clerk of Simpson.County, as well as to the County Administrator of Simpson County and the Simpson County Board of Supervisors.
¶ 50. JUDGE DAVID SHOEMAKE, OF THE THIRTEENTH CHANCERY DISTRICT, SHALL BE SUSPENDED FROM OFFICE FOR A PERIOD OF THIRTY (30) DAYS WITHOUT PAY, EFFECTIVE ON THE DATE OF THE ISSUANCE OF THE COURT’S MANDATE, PUBLICLY REPRIMANDED, FINED $2,500,' AND’ ASSESSED COSTS OF $5,882.67. THE PUBLIC REPRIMAND SHALL BE READ IN OPEN COURT BY THE PRESIDING JUDGE OF THE SIMPSON COUNTY CIRCUIT COURT ON THE FIRST DAY OF THE NEXT TERM OF THAT COURT IN WHICH A JURY VENIRE IS PRESENT AFTER THE ISSUANCE OF THE COURT’S MANDATE, WITH JUDGE SHOEMAKE IN ATTENDANCE.
WALLER, C.J., DICKINSON, P.J., LAMAR AND MAXWELL, JJ., CONCUR. RANDOLPH, P. J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. KING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION ■ ■ JOINED BY KITCHENS, J. BEAM, J., NOT PARTICIPATING.

. McNulty in fact served as the law clerk-for both Walker and Shoemake, but the record indicates that she worked far more closely with Walker than with Shoemake.

. The Second • Amended Complaint, with which neither party takes issue, corrected a typographical error.

. Courtney also serves as the trustee of the special needs trust established for yictoria Newsome. His testimony consisted mainly of chancery court practice and procedure, however, rather than his personal experiences with the Newsome Special Needs Trust or the Newsome Conservatorship.

. The petition and its corresponding bids were found at the bottom of a filing cabinet, and upon théir discovery, Shoemake's counsel forwarded them to the Commission. At the time of the show cause hearing, the Commission’s questioning indicated that it believed that McNulty had never presented a petition to Shoemake.