# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-00013-SCT

*MISSISSIPPI SAND SOLUTIONS, LLC*

*v.*

*BESSIE OTIS, SHERRY FISHER, CONNIE FISHER WALKER, DENNIS ROY HOLMES, ROBBIE JEAN HOLMES WARE, MAGGIE FISHER, GREG COOPER, SHIRLEY FISHER GRAY, HORACE DARRYL FISHER, DERRICK FISHER, RAY W. FISHER, SR., LARRY FISHER, MICHAEL C. FISHER, SR., CORNELIUS FISHER, SR., DIANE FISHER WILLIAMS, SHARON FISHER HILL, SHEILA FISHER KEYS, BRIDGETT WINTERS, LEDORIA FISHER BALDWIN, JOHNNY L. WRIGHT, JAMES FISHER, JR., JIMMY L. WRIGHT, MEMBSEY FISHER, DECEASED, AND MAGGIE FISHER, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/01/2016 |
| TRIAL JUDGE: | HON. JANE R. WEATHERSBY |
| TRIAL COURT ATTORNEYS: | KEVIN E. GAY |
| | JOHN MOONEY |
| | KENNETH B. RECTOR |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | KENNETH B. RECTOR |
| ATTORNEY FOR APPELLEES: | KEVIN E. GAY |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 05/17/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., BEAM AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     Mississippi Sand Solutions, LLC ("MSS") appeals the Warren County Chancery Court's decree that MSS does not have an easement of any type across property owned by a group of heirs, the "Fisher Property." MSS's predecessors used the alleged easement across the Fisher Property to access another parcel of land from which they mined gravel and sand throughout the years. The Fisher heirs, who owned the Fisher Property, claimed that this access was by permission, evidenced by lease agreements with MSS's predecessors. As a result, the Fisher heirs filed a declaratory action against MSS, seeking to have the alleged easement declared invalid. After a trial, the chancellor ruled that MSS did not have an easement across the Fisher Property. MSS now appeals. Given the standard of review and the sufficient evidence in the record, we affirm the chancellor's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2.     The parcel of land subject to this suit is a 99-acre tract in Warren County, Mississippi. Membsey and Maggie Fisher purchased the Fisher Property in 1935. To the east, the Fisher Property is bordered by a tract of land that is owned by C.J. Fisher (the "C.J. Fisher Property"). To the west, the Fisher Property is bordered by a parcel of land that was purchased by MSS in 2014 (the "MSS Property").

¶3.     C.J. Fisher Drive is a private road that runs westerly from Mississippi Highway 27 across the C.J. Fisher Property. The road continues from the C.J. Fisher Property across the Fisher Property and into the MSS Property. The use of the portion of C.J. Fisher Drive that crosses the Fisher Property is the subject of the easement dispute on appeal. Unless otherwise noted, our reference to C.J. Fisher Drive is that portion of the road which crosses

2

the Fisher Property.

¶4.     The Fisher heirs were the heirs of Membsey and Maggie Fisher. The seven initial Fisher heirs were C.J. Fisher, Maggie Lee Otis, Frank J. Fisher, Mabel Peterson, Horace M. Fisher, Membsy Fisher and James M. Fisher. Membsey predeceased Maggie, and Maggie passed away in 1962. Upon Maggie's death, Peterson was appointed as the administratrix of the Fisher Estate. The Fisher heirs also include Robbie Jean Holmes Ware and Dennis Roy Holmes—the children of Peterson—as well as the other six initial heirs' children who were joined in this action (collectively, the "Fisher Heirs").

¶5.     Throughout the years, W.J. Runyon used C.J. Fisher Drive to access the MSS Property (before it was owned by MSS) and the Fisher Property to mine gravel from both properties. Ware testified that Peterson handled all of the leases concerning the Fisher Property. She maintained that she saw "papers" and a lease agreement that provided that Runyon could remove sand and gravel from the Fisher Property. The chancellor, in the final amended decree, noted the existence of two separate mineral leases (one before November 1967 and one in 1968) between various Fisher Heirs and Runyon.[1] Ware also testified that the Fisher Estate received income from the leases from Runyon throughout the years. Janice Turner, one of C.J. Fisher's daughters, testified that her father also received compensation from Runyon.[2]

_____

[1] The chancellor apparently took judicial notice of her court file. *See* M.R.E. 201. On appeal, no party raises any error concerning the chancellor doing so.

[2] There was a question at trial as to why Runyon paid C.J. Fisher. At her deposition, Turner testified that the checks from Runyon were for C.J. Fisher periodically to visit the asphalt plant on the MSS Property to see if the burners were still lit. At trial, Turner testified

3

¶6. At trial, Runyon's son-in-law John Frazier also testified that Runyon used C.J. Fisher Drive to transport gravel from the pits on the MSS Property across the Fisher Property. To weigh the gravel trucks, Runyon installed scales on C.J. Fisher Drive on the Fisher Property. Near the scales, Runyon had a small office with fuel pumps to fuel the trucks. During busy times, one of Runyon's employees was stationed there.

¶7. Frazier agreed that Runyon did have a lease on the Fisher Property that allowed Runyon to mine sand and gravel.[3] According to Frazier, the only entities to use the road from 1972 to 2002 were Runyon and the Fisher Heirs. To Frazier's knowledge, the Fisher Heirs never objected to Runyon's use of the road.

¶8. Pete Buford claimed to have purchased the MSS Property in 2002. He admitted, though, that the property was placed in the name of his "business partner" R.O. Henley, who was Buford's nephew. The 2002 deed reflects that Runyon's widow transferred the MSS Property to Henley.[4] While Buford claimed that he "was paying the notes" and that he paid the purchase price for the MSS Property, he admitted that there was no legal document to show his claimed ownership interest in the MSS Property until 2008. Buford also admitted

---

that the compensation continued past the period of time that C.J. Fisher was checking the burners.

[3] In his testimony, Frazier wavered on this point. Frazier initially testified that there was a lease on the Fisher Property before he started working for Runyon in 1972. Later, when asked on cross-examination if a lease existed between Runyon and the Fisher Heirs, Frazier responded, "Could be. I don't know. I probably haven't seen it." On redirect examination, Frazier again affirmed that Runyon did have a lease with the Fisher Heirs.

[4] The record reflects that Runyon initially had leased the MSS Property. Frazier bought the MSS Property in 1988 and sold it to Runyon. Runyon's wife received the property, presumably after Runyon died.

4

that he did not disclose his claimed interest in the property to his wife during their divorce because he "didn't want to muddy the waters."[5]  According to Buford, Henley "didn't do anything" other than hunt on the MSS Property.  In 2008, Henley transferred the MSS Property to B.P. Buford, LLC.

¶9.    From 2002 until 2014, Buford mined sand, gravel and dirt on the MSS Property.  During this period, he used C.J. Fisher Drive to access the property.  Buford testified that he believed he had a prescriptive easement over the Fisher Property.

¶10.   Early in 2002, Buford testified that one of the Fisher Heirs built a gate across C.J. Fisher Drive.  He maintained that he "snatched it down" with his truck and a chain.  Buford claimed that, fifteen minutes after he pulled the gate down "Mr. Fisher[6] showed up and he said, who tore the gate down and I said I did.  He said, I'm going to put it back up.  I said, well, I'm going to tear it back down."  At first, Buford maintained that the gate was on the Fisher Property—not the MSS Property.  He claimed it was somewhere between the scales and Highway 27.  On cross-examination, when asked whether the gate was on the Fisher Property or the C.J. Fisher Property, Buford responded, "I don't have any idea.  I assume it

---

[5] MSS argues that this Court should find that Buford held the MSS Property in "constructive trust" from 2002 to 2008.  The record testimony is clear, though, that Buford's acquisition of the property in Henley's name was in order to defraud his wife in their divorce action.  Thus, we decline to find a constructive trust.  Further, there is no proof in the record—other than Buford's testimony—that he financed the purchase.  Last, the issue, as discussed below, does not affect the disposition of the case.

[6] The record is unclear as to who "Mr. Fisher" was.  On cross-examination, Buford stated, "He was a Fisher, but I don't remember his name."  Buford stated that he never saw him again and that he understood "that he's deceased."  He also testified, "It was a real elderly fellow.  He was one of the original Fishers.  He told me his name, but I don't remember.  I never seen him before or since."

5

was between the two pieces of Fisher property." After this incident, no one built another gate.

¶11. James Harrell, one of Buford's former truck drivers, testified concerning the gate incident. Harrell testified that Buford did pull down the gate that was across C.J. Fisher Drive about two weeks after Buford had begun operations on the MSS Property. Harrell admitted that he was Buford's friend and that this was the first time since 2002 that he had been asked to recollect the incident. Harrell also testified that the gate that Buford pulled down was the gate on his own property line.

¶12. In 2013, Pete Buford sued Fisher Heirs, seeking judicial recognition of an easement over the Fisher Property. Buford later dismissed the suit, but Ware testified that the dismissal was after the Fisher Heirs met and withdrew permission for the use of the portion of C.J. Fisher Drive that crossed the Fisher Property to any other entities.

¶13. B.P. Buford, LLC, conveyed the MSS Property to MSS in 2014. Under the deed of trust, MSS's obligation to pay Buford $32 million did not begin until MSS began to sell sand and gravel from the MSS Property.

¶14. The Fisher Heirs brought their complaint for declaratory judgment against Buford, Buford Partners, LLC [7] and John Does 1–10 on August 1, 2014, in Warren County Chancery Court. The Fisher Heirs amended their complaint on October 7, 2014, to add MSS. They sought to have the chancery court declare the easement over the C.J. Fisher Property and the Fisher Property invalid.

---

[7] Buford and Buford Partners, LLC, were dismissed by agreed order.

6

¶15. MSS responded with its answer and counterclaim against the Fisher Heirs. MSS claimed an easement across the C.J. Fisher Property and the Fisher Property by express grant or, in the alternative, by prescription. The Fisher Heirs answered the counterclaim and requested that it be dismissed.

¶16. The suit went to trial on August 1, 2016. At trial, MSS stipulated that it did not have an express easement over the Fisher Property. After trial, the chancellor entered a final decree.[8] Upon reconsideration, the chancellor issued an amended final decree. The original decree and the amended final decree, which is discussed below, both found that MSS did not have any type of easement across the Fisher Property.

¶17. MSS now appeals from the chancellor's determination that it does not have an easement by prescription or necessity. In its brief, MSS raises ten issues. For clarity, we re-frame the issues on appeal as follows:

> **I.** **Did the chancellor abuse her discretion in finding that MSS did not have a prescriptive easement across the Fisher Property?**
>
> **II.** **Did the chancellor abuse her discretion in finding that MSS did not have an easement by necessity across the Fisher Property?**

**STANDARD OF REVIEW**

¶18. This Court has described its standard of review of a chancellor's decision:

> "A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. However, the Court will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard. A chancellor's conclusions of law are reviewed de

---

[8] The chancellor granted MSS's counterclaim to the extent that it possessed an easement across the C.J. Fisher Property, as C.J. Fisher had granted an express easement to John Frazier in 1988. No party appealed this portion of the judgment.

7

novo."

***Paw Paw Island Land Co. v. Issaquena & Warren Ctys. Land Co.***, *LLC*, 51 So. 3d 916, 923

(Miss. 2010) (quoting ***Lowrey v. Lowrey***, 25 So. 3d 274, 285 (Miss. 2009)).

**ANALYSIS**

**I.     Did the chancellor abuse her discretion in finding that MSS did not
have a prescriptive easement across the Fisher Property?**

¶19.    MSS argues that the chancellor abused her discretion in determining that MSS was

not entitled to an easement by prescription.  MSS maintains it was entitled to a presumption

of hostility under ***McCain v. Turnage***, 117 So. 2d 454, 455 (1960).  In the alternative, MSS

claims Buford's use of C.J. Fisher Drive from 2002 to 2014 satisfied the hostility

requirement of a prescriptive easement.

¶20.    This Court has described the law governing prescriptive easements:

> To establish a prescriptive easement, use must be proven by
> clear-and-convincing evidence.  Each of the following elements must be met
> by the same clear and convincing standard.  The use must be: (1) open,
> notorious, and visible; (2) hostile; (3) under claim of ownership; (4) exclusive;
> (5) peaceful; and (6) continuous and uninterrupted for ten years.  ***Sharp v.
> White***, 749 So. 2d 41, 42 (Miss.1999).  Use by express or implied permission
> or license, no matter how long continued, cannot ripen into an easement by
> prescription since adverse use is lacking.  ***Id***.  Whether use is prescriptive or
> permissive is ordinarily a question of fact to be determined by the chancellor.
> ***Id***. at 43.

***Paw Paw Island***, 51 So. 3d at 923–24.  Here, the chancellor found that MSS had failed to

show that its use was hostile to the Fisher Heirs.

¶21.    Sufficient record evidence supports the chancellor's conclusion such that we cannot

say that this finding by the chancellor was manifestly wrong.  As her last finding of fact, the

chancellor determined that "[t]he initial use by [MSS's] predecessors was permissive."[9]

Ware testified that she had seen lease documents that demonstrated that the Fisher Property was used with permission. In addition, the chancellor recognized that a lease between Runyon, C.J. Fisher and others was referenced in an assignment of a gravel and sand lease that Peterson accepted in November 1967. The chancellor also found another mineral lease between Runyon and the Fisher Heirs in 1968. Frazier also admitted that Runyon leased the Fisher Property from the Fisher Heirs. Further, as the chancellor recognized, Frazier's ineffectual attempt to obtain an express easement over the Fisher Property evidences that the property was used by permission. Last, Ware testified that the Fisher Estate received regular payments from Runyon, and Turner maintained that Runyon paid her father C.J. Fisher throughout the years.

¶22. The evidence of the various lease agreements also is proof of MSS's predecessors' belief that they needed the Fisher Heirs' permission to use C.J. Fisher Drive. At the least, Runyon and Frazier functioned under the belief that they needed permission to use C.J. Fisher Drive. In other words, they did not believe they had a claim of right over the alleged easement. As such, we cannot say that the chancellor erred in determining that the initial use

---

[9] According to Ware, Runyon used C.J. Fisher Drive by permission only. In fact, Ware testified that all use of C.J. Fisher Drive by any party throughout the years was by permission. This portion of Ware's testimony, though, is subject to exclusion due to MSS's objection on the grounds of hearsay, as Ware admitted that she was not present when permission was given to Runyon to use C.J. Fisher Drive by means of the lease agreements and was told of the permission only after the fact by Peterson. As the statements are unnecessary to support the chancellor's decision, we decline to address whether or not the chancellor properly admitted them under the catchall exception to the hearsay rule. *See* M.R.E. 804(b)(5). Even without considering this testimony, there is sufficient evidence to affirm the chancellor's decision.

of C.J. Fisher Drive over the Fisher Property was by permission.

¶23.    MSS's argument that the lease on the Fisher Property was only to remove gravel from the Fisher Property and not to transport gravel from the MSS Property across the Fisher Property is unavailing.  It was undisputed at trial that Runyon installed and regularly used scales and a small office on the Fisher Property for his entire operation on the Fisher Property and the MSS Property.  Thus, the chancellor's finding that "[t]he use in this matter was either implied by the lease or licensed by the lease" is not manifestly wrong.

¶24.    In her conclusions of law, the chancellor stated, "At the beginning of the use of the Fisher Heirs['] land, there was a lease by W.J. Runyon and Son to recover sand and gravel from the heir land."  This conclusion that a lease existed at the beginning of the use of C.J. Fisher Drive is unsupported by the evidence but does not affect our disposition.[10]  The chancellor, though, correctly found that "[i]f permission is granted to use the road, as was here, that permission will never ripen into a prescriptive easement."  This conclusion is supported by sufficient record evidence such that we cannot day that it is manifestly wrong.

¶25.    MSS claims the chancellor erred by not applying the presumption of hostility espoused in *McCain*.  *McCain*, 117 So. 2d at 455.  In *McCain*, this Court held that "where . . . a use of the lands of another for roadway purposes has been open, visible, continuous, and unmolested since some point in time anterior to the memory of aged inhabitants of the community, such use will be presumed to have originated adversely."  *Id*.  In *McCain*, we recognized that

---

[10] While Ware testified that her knowledge of a lease between the Fisher Heirs and Runyon was "[b]ased on papers I'd seen," she did not testify when she had seen the lease.

> The road, the right to whose use across appellees' land is the subject of this case, has been used by appellants and their predecessors in title, and by other persons and members of the public who had business in the neighborhood, openly, visibly, continuously, and without permission of appellees or their predecessors in title, and without molestation, for more than fifty years.

*Id*. at 454–55.

¶26. We find MSS's argument that the *McCain* presumption should apply here unpersuasive. The *McCain* Court narrowly tailored the presumption to the record before it. *Id*. at 454–55. There, the use had been "without permission of appellees or their predecessors in title, and without molestation, for more than fifty years." *Id*. at 455. Further, this evidence, in *McCain*, was "without dispute" in the record. *Id*. at 454. In contrast, the record here is disputed as to initial permission and conceded against MSS as to subsequent permission. Unlike the claimant in *McCain*, it is undisputed in the record that MSS's predecessors—for a significant period of time—used C.J. Fisher Drive with permission.

¶27. Even if the *McCain* presumption should have been applied, any error on the part of the chancellor does not affect the outcome of the case, as the 1967 lease would have rebutted the presumption. While MSS cites *Wilson v. McElyea*, 815 So. 2d 462, 464-465 (Miss. Ct. App. 2002), for the proposition that unilateral permission cannot subsequently convert hostile intent, the lease would have been a *bilateral* acknowledgment of permission between the parties. Further, MSS had the burden to establish that it was entitled to the presumption and the burden to establish that the presumption satisfied the prescriptive period. On this record, there is insufficient evidence to find that the chancellor would have abused her discretion had she first applied the *McCain* presumption and then found that the 1967 lease converted the

11

hostile intent to permissive use by MSS's predecessors.

¶28.    Also, the chancellor did not err in determining that Buford's account of having to tear down a gate on the Fisher Property was insufficient to show hostility.  Again, the elements of a prescriptive easement must be proven by "clear-and-convincing evidence."  ***Paw Paw Island***, 51 So. 3d at 923–24.  It is not at all clear from the record where this gate was on the various properties.  Buford admitted that he did not know which specific piece of property that the gate was on, and Harrell testified that the gate was on Buford's property line. Further, even Buford was unsure as to which Fisher Heir had erected the gate.  He also claimed to have never seen him before or after the event but knew that he had passed away.

¶29.    Sufficient evidence in the record supports the chancellor's findings and conclusions of law concerning the prescriptive easement.  We cannot say that the chancellor  erred in her ruling; thus, we affirm the determination that MSS does not have a prescriptive easement.

**II.      Did the chancellor abuse her discretion in finding that MSS did not have an easement by necessity across the Fisher Property?**

¶30.    MSS contends that it never has asserted a claim for an easement by necessity.  It argues that the chancellor erred in ruling on the issue.  The Fisher Heirs acknowledge MSS's claim on appeal that it never sought an easement by necessity and do not argue that MSS sought such an easement at trial.

¶31.    In their complaint, though, the Fisher Heirs sought "declaratory relief to properly adjudicate that subject easement over the property is invalid."  The Fisher Heirs claimed that they "would further show that the Defendants are not entitled to an easement by necessity as there is other access to the Defendant[']s property."  In its counterclaim, MSS claimed an

12

easement, first, by express grant (which it later abandoned during the trial) and, second, by prescription. MSS framed its claim of an express easement with some terms that suggested an easement by necessity but did not claim an easement by necessity. At trial, evidence was introduced concerning alternative access to the MSS Property. In the final decree, the chancellor found:

> Defendants also fail to establish an easement by necessity because there are other ways to access the pit. In addition, and importantly, Defendants failed to prove the pit and the Fisher Heir property were once joined as a common property. **Burnham v. Kwentus**, 174 So. 3d 286 (Miss. Ct. App. 2015).

¶32. "An easement by necessity requires proof that (1) the easement is necessary; (2) the dominant and servient estates were once part of a commonly owned parcel; (3) the implicit right-of-way arose at the time of severance from the common owner." **Borne v. Estate of Carraway**, 118 So. 3d 571, 584 (Miss. 2013) (citing **Leaf River Forest Prods., Inc. v. Rowell**, 819 So. 2d 1281, 1284 (Miss. Ct. App. 2002)).

¶33. We affirm the chancellor's determination that MSS did not have an easement by necessity, as the Fisher Heirs requested that the chancellor "adjudicate the subject easement" and the record supports the chancellor's ultimate conclusion. While the chancellor focused on the lack of evidence as to the second element of an easement by necessity, we will focus on the proof offered by the Fisher Heirs to demonstrate that the first element was not met.[11]

---

[11] The chancellor's finding that MSS had offered no proof at trial as to the second element improperly shifted the burden of proof from the Fisher Heirs to MSS. The Fisher Heirs bore the burden at trial on this issue, as they requested that the issue of an easement by necessity be adjudicated. The Fisher Heirs, though, ultimately met their burden by entering evidence that showed that the first element of an easement by necessity was not met.

Sufficient record evidence of alternative access to the MSS Property exists so that we cannot say that the chancellor was manifestly wrong.

¶34. At trial, the Fisher Heirs introduced a tax map that demonstrated that C.J. Fisher Drive crossed the MSS Property, continued through two other parcels and joined Halls Ferry Road. Frazier also testified that, at some point in the past, there had been an alternative access to the MSS Property. Frazier maintained that this access was through another entity's property and had not been used since Runyon's company shut down in 2001 or 2002. Frazier conceded that Runyon had a "right-of-way" with the property owner in the past. Buford supported Frazier's testimony that someone else owned the access to the southern side of the MSS Property. Buford claimed that there was "[n]ot . . . a road, but it's a path down through there." Further, Dennis Roy Holmes, Peterson's son, testified that a gravel road was visible from Halls Ferry Road, leading to the gravel pits on the MSS Property. In light of this record evidence, we cannot determine that the chancellor erred in ruling that MSS did not have an easement by necessity.[12]

¶35. MSS hotly contests the introduction of the tax map by the Fisher Heirs' counsel. In

---

[12] The Fisher Heirs certainly did not address each element of an easement by necessity. This was unnecessary for them to succeed, however, as they sought to have the chancellor determine that an easement by necessity was not merited. While there may be questions as to whether the alternative access exists, what condition it is in and whether MSS has permission or an easement over the other landowner's property, there is sufficient evidence in the record before us concerning alternative access. Thus, we are unable to find that the chancellor was manifestly wrong in determining that MSS had alternative access to the MSS Property. It is bedrock law that "'[a] chancellor sits as a fact-finder and in resolving factual disputes, is the sole judge of the credibility of witnesses.'" *Tice v. Shamrock GMS Corp.*, 735 So. 2d 443, 444 (Miss. 1999) (quoting *Murphy v. Murphy*, 631 So. 2d 812, 815 (Miss. 1994)).

its statement regarding oral argument, MSS claims that counsel for the Fisher Heirs knew or should have known that the tax map was inaccurate before entering it and relying on it. MSS also claims that Holmes "testified falsely that the road existed." These claims, however, are not properly before us. MSS did not make any contemporaneous objection to the evidence, did not cross-examine Holmes and did not raise any of these issues in its post-trial motion to reconsider the judgment. MSS now claims that it could not have objected to the tax map, as the Fisher Heirs introduced it for the purpose of proving the title to the property. This fact did not relieve MSS's duty to object to the use of the map when it was used outside the purpose for which it was introduced. Further, MSS did file a motion to reconsider the judgment but did not raise any issues concerning the tax map or other alternative-access evidence. *See Anderson v. LaVere*, 136 So. 3d 404, 410 (Miss. 2014) ("We will not consider issues raised for the first time on appeal.").

¶36. The issue of an easement by necessity, while not thoroughly presented by the parties, was before the chancellor for determination. The record contains sufficient evidence such that we cannot find that the chancellor was manifestly wrong in determining that MSS did not merit an easement by necessity. Thus, we affirm the chancellor's decree here.

## CONCLUSION

¶37. For the above reasons, we affirm. Sufficient evidence exists in the record to support the chancellor's determination that MSS's predecessors did not obtain an easement by prescription. The record also is sufficient to support the chancellor's finding that MSS did not merit an easement by necessity.

15

¶38.	**AFFIRMED.**

	**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL, BEAM AND ISHEE, JJ., CONCUR.**