# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CP-00928-COA

**STEVE C. THORNTON**                                                  **APPELLANT**

**v.**

**JIMMY D. PURVIS, JANET M. PURVIS, PAUL**                 **APPELLEES**
**VIRGIL OVERBY, TERESA K. OVERBY,**
**TIMOTHY GORDON PATTERSON AND BETSY**
**PATTERSON**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/04/2018 |
| TRIAL JUDGE: | HON. GERALD MARION MARTIN |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | STEVE C. THORNTON (PRO SE) |
| ATTORNEY FOR APPELLEES: | JOHN RAYMOND TULLOS |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 04/14/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE J. WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.

### J. WILSON, P.J., FOR THE COURT:

¶1. Steve Thornton, as trustee of the J.P. Thornton Family Trust, filed suit to establish a prescriptive easement to property that the Trust owns in Simpson County. After a bench trial, the original judge resigned, and the case was reassigned to a successor judge. The parties agreed that the successor judge could make findings and enter a final judgment based on the testimony and record from the original trial. The successor judge found that Thornton failed to meet his burden of proof and denied Thornton's claim for a prescriptive easement.

¶2. On appeal, Thornton argues that we should review the successor judge's decision de novo because the successor judge did not personally observe the witnesses at trial. Thornton

also argues that the successor judge erred by denying his claim for a prescriptive easement. However, we hold that our ordinary "substantial evidence/manifest error test" applies. In addition, we hold that the successor judge did not manifestly err by finding that Thornton failed to prove his claim by clear and convincing evidence. Therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

### *Procedural History*

¶3.     In 2011, Steve Thornton, as trustee of the J.P. Thornton Family Trust, filed suit in the Simpson County Chancery Court seeking a declaration of a prescriptive easement over properties owned by the defendants—Jimmy and Janet Purvis, Paul and Teresa Overby, Timothy and Betsy Patterson, and Sue Turner. Thornton alleged that the Trust—which owns land previously owned by Thornton's parents—was entitled to a prescriptive easement over a private gravel road that crosses the defendants' properties. Thornton alleged that the Trust and its predecessors in title established a prescriptive easement by using the road to access the Trust property since the 1950s. The Purvises, the Overbys, and the Pattersons answered the complaint,[1] denied that the Trust was entitled to an easement, and asserted counterclaims against Thornton for trespass.

¶4.     The case proceeded to a bench trial in 2013 before Judge Joe Dale Walker. However, Judge Walker resigned before rendering a decision. The case was then assigned to Judge Gerald Martin. In 2015, the parties agreed that Judge Martin should render a decision based

---

[1] Sue Turner was living in a nursing home in Madison County at the time of trial. She was served with process and filed an affidavit in response, which the court accepted as her answer to the complaint, but she did not otherwise participate in the case.

on the record and transcript of the 2013 trial without any further testimony. Judge Martin did view the property prior to rendering a decision.

### *Alvie Rankin Road and the Subject Properties*

¶5.     The private gravel road at issue in this case runs west to east beginning at R.T. Womack Road, a public road, and ending near the edge of the Trust's property in rural Simpson County. The road is known as "Alvie Rankin Road," but it has no official name and is not marked by any signs. The road gets its informal name from Alvie Rankin, who lived near the road's present path as early as the 1930s and passed away no later than the 1960s. Rankin was a blacksmith. He did not drive a car. He rode his horse to his home along or near part of the road's present-day path.

¶6.     Today, the Purvises reside on approximately twenty-two acres on the north side of Alvie Rankin Road. Their property borders R.T. Womack Road on the west. The Pattersons own approximately thirty-nine acres on the south side of Alvie Rankin Road across from the Purvises. The Pattersons' property also borders R.T. Womack Road on the west. The Overbys own the property to the east of the Purvises on the north side of Alvie Rankin Road. And Sue Turner owns the property to the east of the Pattersons on the south side of Alvie Rankin Road. The boundary between the northern properties (Purvis and Overby) and the southern properties (Patterson and Turner) runs within the roadbed of Alvie Rankin Road. Thus, the defendants all own different pieces of Alvie Rankin Road. Old fence and tree lines run the length of Alvie Rankin Road on both sides of the road. Alvie Rankin Road ends on the Overby property near the boundary line of the Trust property, which lies beyond the east

3

end of the road.

¶7.     The Trust's property also can be accessed from Cooper Road, a public road, to the east.  However, the Okatoma Creek bisects the Trust's property.  Witnesses testified that despite the creek, the western part of the Trust's property could be accessed by tractor or truck.  However, because of the creek, that route is more difficult and less convenient than access via Alvie Rankin Road.

### Thornton's Case-In-Chief

¶8.     Steve Thornton hired Charles Torrey, a professional land surveyor, to survey Alvie Rankin Road in 2011.  Torrey's survey was admitted into evidence at trial.  Torrey testified that he drove his Chevrolet Suburban on the road to the boundary between the Purvises' property and the Overbys' property.  At that point, however, he stopped because the road was wet and he was concerned that his Suburban would get stuck in the mud.  He proceeded across the Overbys' property on a four-wheeler.

¶9.     Sue Turner's son, Mark Turner, testified that he could recall his family using the road to access their property since he was a young child in the late 1950s or early 1960s.  His father had a dairy farm on the property at that time.  Mark Turner also testified that he could recall the Thornton family using the road in the 1980s to bring out hay from their land.  He testified that the Thornton family planted pine trees on their property around that time. Mark Turner stated that in earlier years county employees did work to maintain the road.[2]  He testified that in the 1980s he did some bush-hogging to maintain the road.

_____

[2] Some witnesses testified that county employees had graded or maintained the road at times; however, there was no evidence that the road is now or ever has been a public road.

¶10. Steve Thornton's cousin David Hopkins testified that he helped the Thornton family harvest hay and corn on the Thornton property in the early 1960s. He testified that they used Alvie Rankin Road to access the property. Steve Thornton's aunt Joanna Barnes and his uncles Thomas and Travis Canoy gave similar testimony regarding the Thornton family's farming activities and use of the road in the late 1950s. In addition, David Hopkins testified that he used Alvie Rankin Road to access the property to hunt during two or three years in the 1990s, and Travis Canoy testified that he used the road to access the property to plant pine trees in 1988 or 1989.

¶11. Steve Thornton's cousin Glenn Hopkins testified that he also helped the Thornton family haul hay from their land as a child. He testified that he could recall the Thorntons using the land for that purpose from approximately 1963 to 1975. Steve Thornton's brother Joe Thornton gave similar testimony regarding his family's use of the road in the 1970s.

¶12. Steve Thornton, who was born in 1958, testified that his father purchased the family's land from Alvie Rankin in 1956. Thornton testified that during his childhood his family grew corn, hay, and timber and raised cattle on the property and used Alvie Rankin Road to access the property, to haul out hay and corn, and to bring cows in and out.

¶13. Around 2006, Steve Thornton informed Timothy Patterson that he intended to use Alvie Rankin Road for logging, but Patterson denied Thornton permission to use the road. In 2010, Thornton hired loggers to cut timber on his family's property. However, by the time they were ready to start work, a gate had been installed at the entrance to Alvie Rankin Road. Joe Thornton took down the gate himself so that log trucks could enter the road. The

5

Pattersons and the Purvises objected and called the sheriff's department. As a result of the dispute, Steve Thornton filed the present action in chancery court.

## *The Defendants' Case-In-Chief*

¶14.    Timothy Patterson testified that his family moved to the property that he now owns on Alvie Rankin Road in 1963, when he was eight years old. Their house was about 500 to 600 yards south of Alvie Rankin Road. His family did not use Alvie Rankin Road to access their house, and the road was not visible from the house. Patterson testified that Alvie Rankin Road "wasn't much of a road [when he lived there between 1963 and 1975]. It was more like a little pig trail." According to Patterson, there was little gravel on the road, and a person usually needed a tractor to get down the road. Patterson lived on his family's property along Alvie Rankin Road until 1975. During that time, the Thorntons' property at the end of Alvie Rankin Road was all timber and was not used for pastures or row crops. Patterson testified that an oil company widened the road and added gravel and culverts in 1976 to accommodate drilling activity in the area.

¶15.    Patterson testified that the Purvises used Alvie Rankin Road but that the Thorntons, the Overbys, and the Turners did not use the road to access their properties. When the Purvises bought their property in 2001, they asked Patterson for permission to use Alvie Rankin Road, and Patterson agreed. The Overbys have a separate right-of-way to their property that crosses the Purvises' property,[3] and the Turners can access their property by a

---

[3] Thornton's surveyor, Charles Torrey, testified that he knew of this right-of-way and had surveyed it for the Overbys' predecessor-in-title, Donald Hankins.

dirt road.

¶16.    Patterson testified that Steve Thornton first contacted him around 2008. Thornton asked Patterson to sign an easement agreement, but Patterson refused. In 2010, the Purvises informed Patterson that Steve Thornton had been making preparations to use Alvie Rankin Road for logging. Patterson told Thornton that he would call the sheriff's department if Thornton continued to use the road. However, Thornton and the logging company used the road to harvest timber anyway. Patterson claimed that the loggers knocked down numerous trees on his property.

¶17.    Janet Purvis testified that she and her husband bought their property in 2001. The Purvises' property includes part of Alvie Rankin Road, and they have an unobstructed view of the road from their house. However, the Purvises primarily access their house from R.T. Womack Road. The Purvises had never given anyone permission to use Alvie Rankin Road. They granted the Overbys' predecessor-in-title, Donald Hankins, a right-of-way across a different part of their property.

¶18.    Purvis testified that around 2005, Steve Thornton's mother and one of his sisters asked for an easement over the Purvises' property on Alvie Rankin Road. However, the Purvises refused to grant them an easement. Purvis testified that Steve Thornton asked them about using the road in 2010, but they did not grant him an easement either.

¶19.    Royce Welch testified that he had lived within two miles of Alvie Rankin Road his entire life and knew Alvie Rankin before he passed away. Between the early 1950s and the

1960s, Welch went to Rankin's house for Rankin to put shoes on his horses. Welch testified that Alvie Rankin Road was just "a little trail" at that time, and "no automobiles . . . went down it." According to Welch, Rankin lived only 200 or 300 yards off R.T. Womack Road, and there was no visible trail to the east of Rankin's house. Consistent with Patterson's testimony, Welch stated that an oil company widened the road and added gravel and culverts in the 1970s. Welch did not believe that the Thornton family ever cut timber on the west side of their property prior to 2010, and he did not believe that the Thorntons had ever used the west side of their property to grow hay or row crops.

### *The Chancellor's Decision*

¶20. On June 4, 2018, Judge Gerald Martin entered an eighteen-page opinion and final judgment. Judge Martin found that Thornton failed to establish a prescriptive easement because he failed to prove four of the six elements of his claim by clear and convincing evidence. Specifically, Judge Martin found that Thornton failed to prove that his family's use of the easement was "open, notorious, and visible"; "hostile"; "under claim of ownership"; or "exclusive." Judge Martin also denied relief on the defendants' counterclaims for trespass because he found that the defendants did not present adequate evidence of their alleged damages. Thornton filed a notice of appeal.

### ANALYSIS

**I.      This Court reviews the chancellor's decision under the substantial evidence/manifest error test.**

¶21. "The standard and burden of proof to establish a prescriptive easement is the same as

a claim of adverse possession of land." *Thornhill v. Caroline Hunt Tr. Estate*, 594 So. 2d 1150, 1152 (Miss. 1992). To establish a prescriptive easement, the claimant must show use of the easement that "was: (1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful." *Id.* at 1152-53 (quotation marks omitted).

¶22. A chancellor's finding that the evidence was insufficient to establish a prescriptive easement is a finding of fact that we review under "the substantial evidence/manifest error test." *Mayton v. Oliver*, 247 So. 3d 312, 322 (¶33) (Miss. Ct. App. 2017). Under that test, we will not reverse unless the chancellor's findings of fact are manifestly wrong or clearly erroneous or the chancellor applied the wrong legal standard. *Darnell v. Darnell*, 234 So. 3d 421, 423 (¶4) (Miss. 2017). We will "accept a chancellor's factual findings unless—given the evidence in the record—we conclude that the chancellor abused his or her discretion, and no reasonable chancellor could have come to the same factual conclusions." *Bluewater Logistics LLC v. Williford*, 55 So. 3d 148, 155 (¶24) (Miss. 2011).

¶23. Each of the elements of a prescriptive easement "must be proven by clear and convincing evidence." *Thornhill*, 594 So. 2d at 1153. "'Clear and convincing evidence' is such a high evidentiary standard that it surpasses even the standard of 'overwhelming weight' of the evidence." *Miss. Comm'n on Judicial Performance v. Shoemake*, 191 So. 3d 1211, 1218 (¶26) (Miss. 2016). "Where the appealing party has such a burden at trial, he necessarily has a higher hill to climb on appeal . . . ." *Mullins v. Ratcliff*, 515 So. 2d 1183,

1189 (Miss. 1987). "Put otherwise, the minimum evidentiary offering from the unburdened appellee necessary for affirmance is less than it would be if the preponderance of the evidence rule applied." *Id.*; *accord Matthews v. Whitney Bank*, 282 So. 3d 786, 794-95 (¶29) (Miss. Ct. App. 2019).

¶24. Thornton argues that we should abandon our usual, deferential standard of review in this case. He contends that we should review Judge Martin's findings de novo because Judge Martin did not preside over the trial or personally observe the witnesses. However, the cases that Thornton cites are inapposite. For example, in *Amiker v. Drugs For Less Inc.*, 796 So. 2d 942 (Miss. 2000), the Supreme Court held that "a successor judge does not possess the power *to vacate an initial judge's order granting a new trial* where . . . the successor judge sits in an inferior position to the first judge." *Id.* at 948 (¶22) (emphasis added). Judge Martin did not vacate any prior findings by Judge Walker. Rather, Judge Martin simply made findings of fact based on the evidence presented at trial and his view of the property—just as the parties agreed that he should.

¶25. In addition, in *Gulf Coast Research Laboratory v. Amaraneni*, 877 So. 2d 1250 (Miss. 2004), the Supreme Court held that the record was "woefully inadequate" to support the findings of a successor judge because, among other issues, the court reporter had failed to transcribe most of the original trial. *Id.* at 1252-54 (¶¶10-15). Therefore, the Supreme Court vacated and remanded the case for a new trial. *Id.* at 1254 (¶15). The problem in *Gulf Coast Research Laboratory* was the adequacy of the record, not the standard of review. In this

case, Judge Martin was provided the full and complete trial transcript, and the parties agreed that the record was adequate for Judge Martin to render a final decision. Thornton simply disagrees with the decision that Judge Martin rendered.

¶26. Although Judge Martin did not personally observe the witnesses, "[t]he rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). "The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Id.* There is no reason to believe that appellate second-guessing of such findings would do anything to improve their accuracy. *Id.* at 574-75. "In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade [ten] more judges at the appellate level is requiring too much." *Id.* at 575. The trial "should be the main event rather than a tryout on the road." *Id.* (quotation marks and ellipsis omitted).

¶27. Thornton agreed that the record created at trial was adequate for Judge Martin to make findings and issue a final decision. That being the case, we apply our ordinary substantial evidence/manifest error test to those findings.

**II. The chancellor did not manifestly err by denying Thornton's claim.**

¶28. The six elements of a prescriptive easement are set out above. *Supra* ¶21. To establish an easement by prescription, *each* of those six elements must be proved by clear-

11

and-convincing evidence. Therefore, the claim fails if the claimant fails to prove even one of the six elements. *See, e.g.*, *Miss. Sand Solutions LLC v. Otis*, 248 So. 3d 813, 818-20 (¶¶19-29) (Miss. 2018); *Paw Paw Island Land Co. v. Issaquena & Warren Counties Land Co.*, 51 So. 3d 916, 923-26 (¶¶27-41) (Miss. 2010); *Biddix v. McConnell*, 911 So. 2d 468, 475 (¶18) (Miss. 2005); *Sharp v. White*, 749 So. 2d 41, 43 (¶9) (Miss. 1999); *Watts v. Jackson*, 281 So. 3d 203, 206 (¶18) (Miss. Ct. App. 2019).

¶29. As noted above, the chancellor found that Thornton failed to prove four of the six elements of a prescriptive easement. As to the "open, notorious, and visible" element, the chancellor found in part:

> The problem with proving this element is the intermittent use proven by the Plaintiff. . . . Most, if not all of the use which was specifically referenced by the Plaintiff or his family members related to hauling hay or harvesting corn. This use is limited to a few days each year. No evidence was shown of daily, weekly or even monthly use or ongoing maintenance by the Plaintiff that might have put property owners on notice that someone was using the roadway. Considering the rural nature of the surrounding area and the lack of residences along the roadway, the Court cannot say that use a few days a year constitutes clear and convincing evidence of open, notorious and visible use.

¶30. A party claiming an easement by prescription is not required to prove "that the way has been in constant use, day and night." *Threlkeld v. Sisk*, 992 So. 2d 1232, 1238 (¶17) (Miss. Ct. App. 2008) (quoting *Rawls v. Blakeney*, 831 So. 2d 1205, 1210 (¶16) (Miss. Ct. App. 2002)). However, the claimant is required to establish that the servient landowner knew of and acquiesced in the adverse use or that the adverse use was "so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed." *Myers v. Blair*, 611

12

So. 2d 969, 971 (Miss. 1992) (quoting *McIntyre v. Harvey*, 158 Miss. 16, 21, 128 So. 572, 573 (1930), *overruled on other grounds by Rutland v. Stewart*, 630 So. 2d 996, 999 (Miss. 1994)).  We cannot say that the chancellor in the present case manifestly erred in finding that Thornton failed to establish this element of his claim by clear and convincing evidence.

¶31.    To begin with, there is substantial evidence to support the chancellor's finding that the Thorntons' alleged use of the road was limited to a few days per year, which would not have provided sufficient notice to other landowners in this rural, sparsely populated area.  Moreover, Timothy Patterson and Royce Welch described the path as just a "little pig trail" or "little trail" until the mid-1970s, when an oil company improved and widened it.  Patterson denied that the Thorntons used the path to plant or harvest crops or hay while he lived there, and Welch similarly denied that the Thorntons had ever grown hay, corn, or other row crops in the area.  Accepting their testimony as true, nothing about the use or appearance of the road should have alerted neighboring landowners to any significant adverse use of their properties.  The testimony of Patterson and Welch conflicted with testimony of Thornton and his other witnesses, who described driving down a gravel road via truck, tractor, and wagon even before the improvements in the 1970s.  However, the mere presence of conflicting evidence does not render the chancellor's findings manifestly erroneous.  Rather, such conflicts must be decided by the trial judge, as the fact-finder.  *E.g.*, *Powell v. Campbell*, 912 So. 2d 978, 981 (¶9) (Miss. 2005).  Therefore, we cannot say that the chancellor manifestly erred by finding that Thornton failed to prove, by clear and convincing evidence, that his

13

family's use of the property was open, notorious, and visible.

## CONCLUSION

¶32.    All six elements of a prescriptive easement must be proved by clear and convincing evidence. If the claimant fails to meet his burden on any one element, the claim fails. We hold that the chancellor did not manifestly err by finding that Thornton failed to establish by clear and convincing evidence that his family's use of Alvie Rankin Road was open, notorious, and visible. Therefore, we need not address the chancellor's findings regarding the remaining elements of Thornton's claim. The judgment of the chancery court denying a prescriptive easement is **AFFIRMED**.[4]

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**

---

[4] Thornton filed a motion in this Court requesting an award of $47,683.25 for his attorney's fees and costs. Thornton alleges that this Court should award him attorney's fees and costs under Rule 11 of the Mississippi Rules of Civil Procedure and/or the Litigation Accountability Act, Miss. Code Ann. § 11-55-1 to -15 (Rev. 2019), because the defendants denied the existence of a prescriptive easement in "bad faith." Thornton's motion is denied because, among other reasons, we affirm the chancellor's finding that Thornton failed to establish a prescriptive easement.